Loretta CHEEK, Plaintiff–Appellant,

v.

**WESTERN AND SOUTHERN LIFE
INSURANCE COMPANY,**
Defendant–Appellee.

No. 93–1840.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1994.

Decided Aug. 1, 1994.

Robert J. Palmer, May, Oberfell & Lorber, Michele Ryan and Kevin Maloney, Law Students (argued), South Bend, IN, for plaintiff-appellant.

Kathleen K. Brickley (argued), Janilyn S. Brouwer, Barnes & Thornburg, South Bend, IN, for defendant-appellee.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Loretta Cheek brought an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a), against her former employer, Western and Southern Life Insurance Company (Western–Southern). The district court entered summary judgment in favor of Western–Southern. Cheek appeals, and we affirm.

## BACKGROUND

Western–Southern employed Cheek as an insurance sales representative from May 22, 1989, to November 8, 1990. On May 7, 1990,

Cheek took disability leave from Western–Southern because of injuries she suffered in a fall at work on January 1, 1990. Pursuant to its policy of providing employees 26 weeks of temporary disability leave, Western–Southern notified Cheek that her employment would be terminated if she did not return to work on or before November 8, 1990. Because she had not yet recovered from her injuries, Cheek was unable to return to work by that date. Western–Southern terminated her employment.

On September 24, 1990, before the termination of her employment, Cheek filed a charge against Western–Southern with the Equal Employment Opportunity Commission (EEOC). *See* 42 U.S.C. § 2000e–5(b); 29 C.F.R. § 1601.7. Cheek claimed that from September 1989 until May 4, 1990, she had been "constantly intimidated by" her sales manager, Greg Petsovich, and that she had been forced to pay her clients' insurance premiums, while three male sales representatives had been neither "intimidated" nor required to pay their clients' insurance premiums. The EEOC investigated Cheek's claims and, on December 26, 1991, issued Cheek a letter of determination. *See* 42 U.S.C. § 2000e–5(f)(1); 29 C.F.R. § 1601.-19(a). The letter stated, in pertinent part:

Examination of the evidence establishes that [Cheek] was not discriminated against as alleged.... The investigation disclosed no evidence which would indicate that [Cheek] was forced to pay for the insurance premiums of her clients, or that male Sales Representative [*sic*] were treated better than she. Witness testimony did not support [Cheek's] allegations that she was treated any different than other male employees in her department. The investigation did not establish that [Cheek's] alleged treatment created an environment so hostile that would be considered intimidating.... [T]he evidence obtained during the investigation does not establish a violation of the statute.

\* \* \* \* \* \*

[Cheek] may only pursue this matter further by filing suit against [Western–Southern] ... in Federal District Court within 90 days of [Cheek's] Receipt of this letter.

Therefore, if a suit if [*sic*] not filed within this 90 day period, [Cheek's] Right to Sue will be lost.

On March 23, 1992, Cheek brought suit against Western–Southern. In her complaint, Cheek alleged that: Western–Southern unlawfully discriminated against her because of her sex (count I); Western–Southern breached the employment contracts it had entered into with her in May 1989 and January 1990 by changing her sales route (count II); and that Western–Southern's district manager, Norman Crady, created a hostile work environment by sexually harassing her and her female co-workers (count III).

The district court granted Western–Southern's motion for summary judgment, finding that Cheek failed to exhaust her administrative remedies with respect to the claims of sex discrimination and sexual harassment. In addition, the court found that the breach of contract claim was barred by two provisions in the parties' employment contracts. By these provisions Cheeks agreed

[n]ot to commence any action or suit relating to [her] employment by Western–Southern until ten days after service upon the Chairman, President or Secretary of a written statement of the particulars and amount of [her] claim.

She further agreed

[n]ot to commence any action or suit relating to [her] employment with Western–Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary.

The court found that Cheek had neither served Western–Southern with ten days' notice of her intention to bring suit relating to her employment, nor commenced her suit within six months after the date of her discharge. This appeal followed.

## DISCUSSION

■ We review the grant of summary judgment *de novo*. *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir.1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We view the record and all justifiable inferences drawn from it in the light most favorable to the party against whom judgment was entered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, *id.* at 44, 94 S.Ct. at 1017, and of giving the employee some warning of the conduct about which the employee is aggrieved. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992); *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir.1989). Although the rule is not jurisdictional, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392, 102 S.Ct. 1127, 1131, 71 L.Ed.2d 234 (1982), it is a condition precedent with which Title VII plaintiffs must comply. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir.1985). For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge.

■ Nevertheless, because most EEOC charges are completed by laypersons rather than by lawyers, a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint. *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir.1992). The test for determining whether an EEOC charge encompasses the claims in a complaint therefore grants the Title VII plaintiff significant leeway: all Title VII claims set forth in a complaint are cognizable that are " 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.1976) (en banc) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir.1971)), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). Thus the test of *Jenkins* is satisfied if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge. The second part of the test is difficult to apply because it requires speculation as to what the EEOC might or might not discover in the course of an investigation. Nevertheless, we need not so speculate in this case, because Cheek fails to satisfy the first part of the test.

## A. Unlawful Sex Discrimination

■ In determining whether Cheek's claim of sex discrimination is reasonably related to the allegations in her EEOC charge, we initially examine the factual allegations in the body of the charge. *Schnellbaecher*, 887 F.2d at 127. Cheek alleged in her charge that:

> From September 1989, and on till [*sic*] May 4, 1990, I was being constantly intimidated by Greg Petsovitch, [*sic*] Staff Manager, and was forced to pay for my client's insurance premiums.

>    *    *    *    *    *    *

> I believe I have been discriminated against because of my sex (female) and that Respondent may have violated my Title VII Rights because:

> To my knowledge Mr. Greg Smith, Mr. Randy Morris, and Mr. Larry Leine, also male representatives, are not being intimidated, or asked to pay for their clients' insurance premiums, whereas I was.

Cheek also checked the "sex discrimination" box on the EEOC charge form (the form also includes boxes for discrimination based on race, color, religion, national origin, age, and retaliation). She claimed in count I of her complaint that Western–Southern unlawfully discriminated against her on account of her

sex by transferring her from her original sales route to a less-lucrative sales route and by engaging in a pattern or practice of transferring women sales representatives to unprofitable sales routes.

■ Both the EEOC charge and count I of the complaint thus assert forms of sex discrimination. But the issue before us is whether the claims in count I of the complaint are "like or reasonably related to" the allegations in the EEOC charge. We hold that they are not. Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination. The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*. *See, e.g., Rush,* 966 F.2d at 1110 (EEOC charge and complaint not alike or reasonably related where employee complained to the EEOC of only certain episodes of discrimination, and then sought judicial relief for different episodes of discrimination); *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 984 (10th Cir.1991) (charge filed with EEOC of discrimination regarding 1986 disciplinary action and 1988 termination did not permit challenge to 1979 nonpromotion); *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1312 (7th Cir.1989) (claim of racial harassment not preserved when EEOC charge pertained to earlier time period, only asserted discriminatory failure to promote, and referred to different employees). Cheek's EEOC charge and complaint fall far short of satisfying this requirement.

*Rush v. McDonald's Corp., supra,* 966 F.2d 1104, helps to illustrate this point. Rush, a black woman, was employed by McDonald's as a word processing specialist before she was discharged. She filed a charge with the EEOC in which she stated:

I began my employment as a Part-time word processor on November 11, 1985. I became a Full-time word processor on January 1, 1988. On May 6, 1988, I was told by Sharon Funston, Supervisor that I was being terminated. I believe that I have been discriminated against because of my race, Black.

*Id.* at 1108 n. 9. She also filed an affidavit with the EEOC in which she stated:

I would like to state that Sonia Roach (W) was hired in April 1986 as a part time word processor and in 2 months she became a full time employee. I believe that McDonald's has continuously allowed white employees to advance in the company. Blacks have not been allowed to advance as quick.

*Id.* at 1110.

After the EEOC investigated Rush's charge and notified her of her right to sue, Rush filed a complaint against McDonald's in district court. In count I of her complaint, she alleged five instances of race discrimination: her discharge; denial of promotion from part-time to full-time status; denial of employee benefits; harassment; and adoption of a policy of filling the word processor position with minorities and of hiring minorities on a part-time basis more frequently than non-minorities. *Id.* at 1108.

We held that Rush's first two claims—of racial discharge and of denial of promotion—were cognizable because Rush had specifically described the conduct giving rise to these claims in her EEOC charge and affidavit. *Id.* at 1111. We further held, however, that Rush's remaining three claims—of denial of benefits, of harassment, and of adoption of a racially discriminatory policy—were not cognizable. In so holding, we observed that, while "'technicalities are particularly inappropriate in a statutory scheme [like Title VII] in which laymen, unassisted by trained lawyers, initiate the process,' the requirement of some specificity in a[n EEOC] charge is not a 'mere technicality.'" *Id.* (quoting *Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972)). Rush had failed to preserve her claims of denial of benefits, harassment, and adoption of a racially discriminatory policy because she had not specifically described the conduct giving rise to these claims in her EEOC charge. *Id.* at 1111–12.

Similarly, in her EEOC charge, Cheek did not describe the conduct giving rise to the claims of sex discrimination in count I of her complaint. In count I of her complaint, Cheek alleged that district manager Norman Crady had a practice of assigning female employees to unprosperous sales routes and that Crady discriminated against her because of her sex by transferring her from the Elkhart sales route to the less-profitable South Bend sales route. The charge, by contrast, was based on Petsovich's requirement that Cheek, but not Cheek's male counterparts, pay clients' insurance premiums. Thus the charge is unrelated to the claims in count I in at least two ways: the type of conduct alleged to be discriminatory, and the identity of the individuals involved. These differences between the claims in the complaint and the allegations in the charge cannot be overlooked, even under the liberal standard of pleading applied to allegations in an EEOC charge. Because Cheek was not professionally trained as a lawyer, we could not expect her to artfully draft the allegations in her EEOC charge; however, she must at least have described, with some degree of specificity, the conduct she considered discriminatory. She did not. As a result, the charge failed to serve its dual purpose of giving Western–Southern notice of the factual basis for the claims of sex discrimination in Cheek's complaint, and of affording the EEOC an opportunity to investigate the claims.

■■■ Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations. *See, e.g., Rush,* 966 F.2d at 1110–11 (plaintiff's EEOC affidavit contained "explicit reference" to types of discrimination alleged in complaint); *Box v. A & P Tea Co.,* 772 F.2d 1372, 1375 (7th Cir.1985) (handwritten addendum to typed charge of race discrimination, also suggesting sex discrimination, sufficient to permit judicial claim), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986). We agree with Cheek that, in assessing the scope of the EEOC charge, we may consider her statements in a sworn affidavit that she filed in support of the charge. Cheek refers to her transfer to the South Bend sales route in the affidavit:

In September 1989, I was transferred to another account under a different manager and [in] a different location. My first account, was account 5 located in Elkhart. When I was transferred to my second account I was sent to South Bend under Account Num. 41. During my first couple of months on account 41 my manager ... manipulated the funds as he saw fit and I ended [up] paying for my customer's insurance premium because the money was not there. There are more male agents than female agents and to my knowledge none of this ever happened to the male agents.

These statements do not help Cheek. Cheek did not refer to her transfer from the Elkhart sales route to the South Bend sales route for the purpose of having the EEOC investigate the motivation behind it. Rather, she mentioned the transfer only as background for her claim relating to Petsovich's requirement that she pay insurance premiums for her clients. Significantly, Cheek failed to state that the South Bend route was less lucrative than the Elkhart route or the routes to which her male counterparts were assigned. Nor did she state, or even suggest, that Western–Southern had a pattern or practice of transferring women to less-lucrative sales routes.

Cheek invites us to stray even further from the body of the EEOC and consider the allegations she made in a sixteen-page, handwritten letter dated November 12, 1990, that she sent to the EEOC. We accept, but only to the extent that the letter may be considered an amendment to the original charge within the meaning of 29 C.F.R. § 1601.12(b). This regulation allows a charge to be amended "to clarify and amplify allegations made therein." Cheek's letter, for the most part, describes in great detail how Petsovich manipulated her funds and forced her to pay the insurance premiums of her clients. This description clarifies the conduct that we have said is not reasonably related to the claims of sex discrimination in count I of Cheek's complaint.

The letter also includes allegations that do not appear in the EEOC charge. For exam-

ple, Cheek alleged that she was treated less favorably by Petsovich and Norman Crady than two of her male counterparts, Randy Morris and Larry Leine, because Crady and Petsovich allowed Morris to miss two weeks of work at a time while she was not allowed to miss even one day. Cheek also alleged that, one month after Leine had quit his job with Western–Southern, he continued to receive a paycheck as a result of a special deal with Crady and Petsovich. Finally, Cheek alleged that, although the South Bend sales route was larger than the Elkhart route, because Petsovich manipulated the funds in her account, the South Bend route proved to be less profitable than the Elkhart route.

Nevertheless, pursuant to 29 C.F.R. § 1601.12(b), these additional allegations cannot expand the scope of the allegations in Cheek's original charge; they only may "clarify or amplify" the allegations in the charge. Perhaps Cheek's allegations that Leine and Morris received special treatment clarify Cheek's allegation in her EEOC charge that Petsovich did not intimidate Morris and Leine like he did her. But, as we have noted, the allegation of intimidation is unrelated to the claims in count I of Cheek's complaint. If the allegation in Cheek's EEOC charge that the South Bend sales route proved to be less profitable than the Elkhart route were interpreted as an allegation that the decision to transfer Cheek was based on unlawful sex discrimination (and this is an extremely charitable interpretation), the allegation might be related to the claims of unlawful sex discrimination in count I of Cheek's complaint. Nevertheless, the allegation would still exceed the permissible scope of an amendment to the original charge by expanding the allegations in the charge. For, as discussed above, Cheek's original charge fails to assert anything relating to her transfer to South Bend, and her affidavit mentions the transfer only as background for her claim relating to Petsovich's manipulation of her funds.

## B. Sexual Harassment

In count III of her complaint Cheek alleged that Norman Crady created a hostile work environment through his sexual harassment of her and other women in her office. When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge. Ordinarily, a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination. *See, e.g., Nicol v. Imagematrix, Inc.,* 767 F.Supp. 744, 752–54 (E.D.Va.1991); *Torriero v. Olin Corp.,* 684 F.Supp. 1165, 1170 (S.D.N.Y.1988); *cf. Baltzer v. City of Sun Prairie/Police Dep't,* 725 F.Supp. 1008, 1019 (W.D.Wis.1989) (allegation of discriminatory restrictions on pregnant police officers not reasonably related to administrative charge of sexual harassment and hostile environment). So it is here. The claim of sexual harassment in count III of Cheek's complaint cannot be reasonably inferred from the allegations of sex discrimination in her EEOC charge.

But Cheek concedes that she did not claim that Crady sexually harassed her by making disparaging or sexually suggestive comments until her complaint. In arguing that this claim nevertheless falls within the scope of the claims she pursued before the EEOC, Cheek points to statements in her charge, affidavit, and letter of November 12, 1990. Cheek alleged in her EEOC charge that her staff manager "intimidated" her. And in her EEOC affidavit, Cheek alleged that the staff manager treated her in a "hostile, inferior, unprofessional manner." The claim of sexual harassment in count III of Cheek's complaint cannot be inferred from these allegations because nothing in the charge or affidavit suggests that Cheek was complaining of a *sexually hostile environment.* In this connection, this case may be distinguished from *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., supra,* 538 F.2d 164. Jenkins, a black woman, brought a suit against Blue Cross Insurance Company, her former employer, claiming sex and race discrimination. Prior to bringing suit, Jenkins filed an EEOC charge against Blue Cross wherein she alleged discrimination based upon race. She checked the "race discrimination" box on her EEOC charge form. In the body of her

charge, Jenkins noted instances in which she had purportedly been treated differently because she was a woman; however, she did not specifically allege sex discrimination. Specifically, she stated:

> I feel that I am being discriminated in the terms and conditions of my employment because of my race, Negro. I have worked for Blue Cross and Blue Shield approx. 3 years during which time I [had] no problem until May 1970 when I got my natural hair style. Later when I came up for promotion it was denied because my supervisor ... said I could never represent Blue Cross with my Afro. He also accused me of being the leader of the girls on the floor.... A White employee who associated with me might have been denied her promotion because of her association with me.

*Id.* at 167. The district court dismissed Jenkins' claim of sex discrimination on the ground that Jenkins had not alleged it in her EEOC charge. We considered Jenkins' appeal *en banc* and reversed the district court's judgment, holding that the allegations in the EEOC charge sufficiently alleged sex discrimination to allow Jenkins to pursue a claim of sex discrimination in federal court. *Id.* at 169.

The relationship between the EEOC charge and the complaint was sufficient because the allegations in the EEOC charge and the claim of sex discrimination in the complaint were based upon Blue Cross' failure to promote Jenkins after she changed her hairstyle to an Afro. Jenkins attached the most obvious legal theory, race discrimination, to Blue Cross' conduct. That Blue Cross might have discriminated against Jenkins on account of her sex was less obvious. Nevertheless, Jenkins' allegations that her supervisor accused her of "being the leader of the girls on the floor" and that a *white female* employee was not promoted because she associated with her telegraphed a claim of sex discrimination. We were willing to excuse Jenkins for not attaching the theory of sex discrimination to Blue Cross' conduct before filing a complaint because she was not trained in the law and, like other laypersons, could not be expected to identify each and every legal theory that a single set of facts might invoke. Moreover, her EEOC charge provided ample notice to Blue Cross of the substance of her complaint because Blue Cross' lawyers could be expected to realize that the facts as alleged in the EEOC charge might support a claim of sex discrimination.

Here, a claim of sexual harassment cannot be reasonably inferred from anything alleged in Cheek's charge. Cheek, unlike the plaintiff in *Jenkins,* did not refer to conduct in her EEOC charge that might invoke a legal theory other than the one she checked on her EEOC charge form. The description of Petsovich's conduct in Cheek's charge and EEOC affidavit supports only one theory, that of sex discrimination. The EEOC defines sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... [when] such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.-11(a); *see also Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Cheek's EEOC charge does not describe the type of conduct that would fit into this definition. We can conceive of circumstances under which a claim of sexual harassment could be inferred from Cheek's allegation that Petsovich treated her in a "hostile, inferior, unprofessional manner." But such an inference would be unreasonable under the circumstances of this case because it is clear that this allegation derives from Cheek's having to pay her clients' insurance premiums. Moreover, even if the allegations in Cheek's charge could support a claim of sexual harassment, the claim would be against Petsovich. The claims of sexual harassment in count III of Cheek's complaint are against *Crady.*

The only reference in Cheek's EEOC filings to anything that might be considered sexual harassment is in the letter of November 12, 1990. There Cheek states:

> The whole time I worked for [Western–Southern], Mr. Crady continuously asked me, if you don't make it in this business you have a husband to fall back on, over

and over he made this remark to me, about me having a husband to fall back on.

We doubt that such comments rise to the level of sexual harassment. *Cf. Harris v. Forklift Sys., Inc.,* — U.S. —, —— —, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) ("[The] 'mere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII.") (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). But even if they did, Cheek's claim of sexual harassment cannot be inferred from them. As noted above, the letter of November 12, 1990, is relevant only to the extent that it constitutes an amendment to the original EEOC charge, and an amendment only can "clarify or amplify" allegations in the original charge. Cheek's allegation that Crady made disparaging and sexually suggestive comments to and about her neither clarifies nor amplifies any claim in her EEOC charge. Her EEOC charge does not even mention Crady, much less the notion that he created a sexually hostile work environment.

We may grant that, if the EEOC considered the allegation of sexual harassment against Crady to be a permissible amendment to Cheek's EEOC charge and therefore investigated Crady's conduct, the allegation of sexual harassment should be treated as if it were part of the charge. For, if the EEOC treated the allegation as an amendment to the charge, the EEOC would have had an opportunity to investigate the allegation and settle the dispute through conference, conciliation, and persuasion. The investigation, moreover, would have put Western–Southern on notice that Cheek was claiming that Crady had sexually harassed her. If it were part of Cheek's EEOC charge, the allegation against Crady might well support the claim of sexual harassment in count III of Cheek's complaint.

Cheek argues that the EEOC treated the allegation against Crady as part of her charge by actually investigating it. In support of this argument, she points to the EEOC's letter of determination, which states in relevant part that "[t]he investigation did not establish that [Cheek's] alleged treatment created an environment so hostile that would be considered intimidating." According to Cheek, this reference to a "hostile environment" indicates that the EEOC investigated the allegation in her letter of a hostile environment based on Crady's sexual harassment. We cannot agree. The hostile environment to which the EEOC refers is the one allegedly created by Petsovich through his intimidation of Cheek. This intimidation, we have noted, had nothing to do with sexual harassment.

### C. Breach of Contract

Finally, Cheek alleged in count II of her complaint that Western–Southern, in transferring her from the Elkhart sales route to the South Bend sales route, breached its employment contract with her. Cheek concedes that this claim is barred by the provisions in her employment contract under which she agreed to give Western–Southern ten days' notice if she planned to bring a suit relating to her employment, and not to bring a suit relating to her employment more than six months after termination of her employment. Cheek commenced this suit more than sixteen months after she was discharged, and without notifying Western–Southern that she was doing so. Cheek argues that the limitations period should nevertheless not be enforced because, if she had filed her breach of contract claim within the limitations period and not received a letter of determination from the EEOC until after the limitations period had run, her Title VII case would have been barred by the doctrine of collateral estoppel.

Cheek did not raise this issue in the district court. She argued below that the provisions should not be enforced as a matter of public policy, that the contract should not be enforced because she did not read it before signing it, and that her filing of an EEOC charge tolled the contractual limitations period. A litigant forfeits appellate review of an issue on appeal by failing to raise it in the district court. *United States v. Olano,* — U.S. —, ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993); *United States v. Davis,* 15 F.3d 1393, 1407 (7th Cir.1994).

So it is with the collateral estoppel issue. By failing to raise that issue in the district court, Cheek forfeited her right to raise it on appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.